Page 29

Q. Oh, okay. Can you just like -- we don't need to mark it on here or anything, but can you just sort of number them?
**A. So we go one, two, three, four, five, six, seven, eight, nine, ten, and then it goes all the way back like that.**
Q. So are one through four, they're arranged differently? They're sort of arranged all in a row; whereas they're only two wide the rest of the way down; is that fair?
**A. Yes. These are express lanes.**
Q. Okay. Got you. Are those self-checkout?
**A. No.**
Q. Does Target do that at all?
**A. Nope.**
Q. Good. I suppose that makes loss prevention somewhat easier, but I don't really know. Then the 83 through 88, can you see those in the distance on that shot?
**A. Yes. That's the last five lanes down here.**
Q. Okay. And are these arranged any differently? Are those express lanes?
**A. No. They're the same as these other lanes.**
Q. Okay. On the far end there, I guess 87 and 88, they're arranged like the same -- they're stacked the same way that five and six are; is that right?
**A. Yes.**

Page 30

Q. So the camera shots for let's say five and six, they would be one shot for each of these?
**A. Yes.**
Q. And what would it show?
**A. It's going to show the cash register, the cashier, and then really it's just this snapshot here.**
Q. So like from the end all it shows is the physical structure?
**A. It's going to show -- well, really the camera's here, so it points right here. So it's going to show the cashier, the drawer, and then the person that's standing here.**
MR. WILLMARTH: It's a straight-down shot.
THE WITNESS: It's a straight-down shot.
BY MR. SLAGER:
Q. How would you describe the Starbucks' shot?
**A. It is also a straight-down shot.**
Q. Okay.
**A. It covers the register and then where the barista stand is.**
MR. WILLMARTH: My hearing is shot.
THE WITNESS: I'm sorry. I mumble.
MR. WILLMARTH: Speak up.
THE WITNESS: It covers where the barista stand is and the register.

Page 31

BY MR. SLAGER:
Q. And I have no idea if there is, but is there like a term of art in your job for what this shot shows?
MR. WILLMARTH: Pointing to Exhibit 1.
BY MR. SLAGER:
Q. Pointing to Exhibit 1, of Food Avenue.
**A. What do you mean?**
Q. Well, like is straight down -- you said the registers are a straight-down shot. Is there a label that you would put on this shot? Do you know what I mean?
**A. Not really.**
Q. Okay.
**A. It's just based off what we're trying to capture. So for register shots, we're trying to capture what's going in and out of the register. So the best view to get that would be in all the resources that we have.**
Q. Right. And why is this one wider?
**A. This one is wider so that we can capture both of the registers on one, only using one camera.**
Q. Okay. Have you ever seen this Order to Preserve, which we'll mark as Exhibit 3?
**A. Yes.**
Q. Do you know when you first saw it?
**A. I don't remember the exact date, but it's when it came to the store.**

Page 32

Q. Okay. This shot here in Exhibit 2, do you know what this wide panorama shot is called? I don't remember if it has a name like Food Avenue or not.
**A. It does. It's called front lanes.**
Q. Front lanes. Thank you. Were you responsible for putting together a response or making sure that Target was in compliance with this Order to Preserve?
**A. I was.**
Q. So did you set aside the video that was --
MR. WILLMARTH: I'm just making a formal objection to the use of that order in reference to -- and you're going to ask the questions about it -- simply because we had no participation in that order, and there's no basis for an extraordinary order such as that. But go ahead.
BY MR. SLAGER:
Q. Have you seen the finished product, the disk that ultimately was given to my office in response to this order?
MR. WILLMARTH: I'll object to the form of the question.
BY MR. SLAGER:
Q. Okay. Have you seen the finished product, the disk that was --
MR. WILLMARTH: No, no. You're

Page 33

misunderstanding my objection. Make me explain it.
MR. SLAGER: Maybe.
MR. WILLMARTH: Let me explain it. May I just voir dire the witness?
VOIR DIRE EXAMINATION
BY MR. WILLMARTH:
Q. Did you create any video after you got this order? Did you save anything after you got this order?
**A. No.**
Q. All the video that you have, you had already saved before this order was even issued?
**A. Yes.**
MR. WILLMARTH: Okay. Go ahead.
EXAMINATION (CONTINUED)
BY MR. SLAGER:
Q. So as far as you know, neither you nor Target did anything in response to this order; is that right?
MR. WILLMARTH: That's not, that's not what --
VOIR DIRE EXAMINATION
BY MR. WILLMARTH:
Q. Did you do something when you got this order?
**A. I did.**
Q. What did you do?
**A. I --**

Page 34

MR. WILLMARTH: I'm sorry. It's your dep.
MR. SLAGER: That's okay.
EXAMINATION (CONTINUED)
BY MR. SLAGER:
Q. Go ahead. You can answer his question.
**A. I attempted to save the video, but it was already gone.**
Q. Okay. And it looks like this was entered January 26th. You don't remember offhand which date you first saw this, do you?
**A. It wasn't the date that this was marked. It was after, but I don't remember exactly the date.**
Q. Okay. And --
MR. WILLMARTH: I have a document that might refresh her recollection, if you want to wait one second.
MR. SLAGER: I probably do, too. I'm not --
THE WITNESS: I faxed it.
MR. SLAGER: If we get to it.
THE WITNESS: I faxed it the same day that I got it so --
MR. WILLMARTH: That's what I was going to get, was the fax.
MR. SLAGER: Okay.

Page 35

(Off the record at 2:41 p.m.)
(Back on the record at 2:41 p.m.)
MARKED FOR IDENTIFICATION
DEPOSITION EXHIBIT 3
2:41 p.m.
BY MR. SLAGER:
Q. Okay. So Mr. Willmarth has just given us a copy of a fax, which we might as well mark as Exhibit 4. But it looks like you got this letter on January 31st, and then you immediately sent it out to this guest reporting number; is that correct?
**A. Yes.**
**MARKED FOR IDENTIFICATION**
**DEPOSITION EXHIBIT 4**
**2:43 p.m.**
**BY MR. SLAGER:**
Q. So do you have any reason to doubt that the incident that we're all here for today happened on January 4? Do you have any reason to doubt it --
**A. Yes.**
Q. -- is what I asked. Okay. There should have been some shots in the store then that would have still been stored in the normal course of business from January 4 until January 31st; is that right?
**A. No. When we went back, it was right on that cusp as far as that -- of the time frame, as far as what it saved. So it was gone at that point.**

Page 36

Q. Okay. But based on the incident reports, based on your knowledge of what had happened on January 4, you went ahead and saved some video right away at the time of the incident, correct?
**A. Right. So it's Target's best -- at Target our best practice is to save video before, during, and then after the incident.**
MR. WILLMARTH: He's asking a different question.
THE WITNESS: Oh.
MR. WILLMARTH: When did you save the video?
THE WITNESS: Oh, we saved the video I believe on the 5th.
MR. WILLMARTH: Okay. Is that when you came in or --
THE WITNESS: Yes.
MR. WILLMARTH: How did that happen?
THE WITNESS: Yes. It was the day that I came in, which was the next day.
MR. WILLMARTH: It could have been later that day?
THE WITNESS: It could have been, yeah.

MR. WILLMARTH: All right. Were you in the store when the incident actually occurred?
THE WITNESS: No.
MR. WILLMARTH: Okay.
BY MR. SLAGER:
Q. So was it on the 5th of January that you set aside the data, that in keeping with Target's best practices, you felt was -- showed before, during, and after this incident?
**A. Yes.**
Q. Do you know who operated the manual camera that showed what was going on outside when Mrs. Jackson was taken away?
**A. I believe it was my team member that worked for me at the time, Alex Zang.**
MR. WILLMARTH: Z-A-N-G?
THE WITNESS: Z-A-N-G, yep.
BY MR. SLAGER:
Q. What's Alex's title?
**A. He now works at the Commerce Township store, and he's the assets protection team leader.**
Q. And what was his title when he was working at Livonia?
**A. He was a Target protection specialist.**
Q. So did he get a promotion?
**A. He did.**



Q. Now, he is a team leader. And the step above that at his new store would be executive team leader, right?
**A. If you were to get promoted again, yeah.**
Q. Yeah. So who's the regular team leader of assets protection at Livonia?
**A. What do you mean?**
Q. You're the executive, right?
**A. Yes. Not every store is structured the same, so my store has -- we call them ETL's, but executive. And then I have two Target protection specialists that work for me.**
Q. Okay.
**A. At Alex's store, there's not an executive. There's just a team leader over assets protection.**
Q. So he -- within the company he's not as high up as you, but he's sort of doing the same thing and --
**A. He serves the same functions.**
Q. Okay. And I'm sorry. What store did you say he's at now?
**A. The Commerce Township.**
Q. How many cameras are there in the store that you can operate, change the shot manually like that?
**A. We have six.**
Q. Where are those located today?
**A. Those are always in the same spot. So we have one**



**that's outside. One that covers our front lanes. I'm sorry. We have seven. One that covers our jewelry boat. One that covers our women's soft lines. We have two in electronics, and one over by our market section.**
Q. Do you know how many cameras there are total in the store?
**A. Not off the top of my head.**
Q. Roughly?
**A. Roughly between 40, 50.**
Q. Do you replace the cameras on an as-needed basis, or do you go through and change out all the equipment at once from time to time?
**A. No. It's on an as-needed basis.**
Q. Okay. Do you know who the manufacturer is of the cameras in your store?
**A. I don't.**
Q. So you wouldn't know if they have any relationship to the vendor that provides service on the camera system?
**A. I don't.**
Q. I don't know if this is even a question that makes sense, but do they have -- is there like a number of frames per minute or per second that are stored? If there is, you wouldn't know?
**A. I don't know.**



Q. Okay. But generally it looks like pretty good, clear shots as opposed to some I've seen.
**A. Yeah.**
Q. Do you know why the front lanes shot that was saved is significantly longer than the Food Avenue shot that was saved?
**A. It was based off where you could view the incident, so there was a better -- the Food Avenue shot didn't capture really the whole incident. So the front lane shot gave the best view of -- we try and get as many different angles as we can so that you can really have a true picture of what happened. And the front lanes showed everything; whereas the Food Ave just showed one small portion.**
Q. Okay. Do you know what front lanes showed after the Food Avenue shot ends? I'm not asking that question very well, but what was it that you meant to include in that wider front lanes shot that took place after the end of the food lanes?
**A. The front-end shot captures everything from, you know, the time where she's walking okay to where she slips and falls, to where the EMS comes, and then to where after she's taken out. So that gives a full, clear snapshot.**
Q. Okay.